IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

J. JEANNETTE LOVERN, PHD.      :     CIVIL ACTION
                                       :
          v.                         :     NO. 08-0082
                                         :
CYNTHIA JACKSON, *et al.*          :

MEMORANDUM OPINION

Savage, J.                                               February 3, 2015

In this employment discrimination action, the plaintiff Dr. J. Jeannette Lovern, who is white, was a professor of education at the University of the Virgin Island's ("UVI") St. Croix campus. She alleges that she was denied tenure, ultimately terminated and subjected to a hostile work environment because of her race and in retaliation for making workplace complaints of discrimination, all in violation of Title VII of the Civil Rights Act of 1964.[1] She also brings territorial claims for breach of contract under UVI's Faculty Policy Manual ("FPM"), intentional interference with her employment relationship and defamation. She has named as defendants UVI, her former employer; Al Hassan Musah, UVI's Provost; and Cynthia Jackson, former Chairperson of UVI's Education Division.

Defendants UVI and Musah have moved for summary judgment. After reviewing the record and considering the parties' submissions, we shall grant the motion in part and deny it in part.

There are disputed issues of material fact that preclude summary judgment on Lovern's claims of wrongful termination and retaliation. Lovern has produced evidence

---

[1] 42 U.S.C. §§ 2000e *et seq* (2006).

that could lead a reasonable factfinder to conclude that she was denied tenure, which led to her termination, due to prohibited discriminatory and retaliatory animus.  There are also disputed facts concerning whether Musah intentionally interfered with her employment contract and whether UVI breached her employment contract by voting to deny her tenure and failing to provide her with the requisite notice of termination.  Thus, we shall deny the motion as to these claims.

On the other hand, Lovern's hostile work environment claim is barred by the statute of limitations.  She has not made out a case of defamation against Musah.  Therefore, we shall grant the defendants' motion for summary judgment with respect to the hostile work environment and the defamation causes of action.

## Background

In 2002, UVI hired Lovern as a tenure track associate professor of education.  Pursuant to UVI policy, she entered into a series of fixed-term employment contracts before her employment ended.  On December 10, 2002, she received her first contract for the 2003-2004 academic year.[2]  The following December, she entered into a two-year contract for 2004-2006.[3]  On December 15, 2005, Lovern entered into her last contract for 2006-2008.[4]  Lovern was working under this contract, which began on August 16, 2006 and ended on May 28, 2008, during most of the events relevant to this case.  She became eligible to apply for tenure in the spring of 2007.[5]

---

[2] Pl.'s Resp. to Defs.' Statement of Uncontested Material Facts (Doc. No. 110) ("Pl.'s RDSF") ¶ 9.

[3] Pl.'s RDSF ¶ 10.

[4] Pl.'s RDSF ¶ 12.

[5] Pl.'s RDSF ¶ 19.

*The Education Division*

In July 2006, when UVI hired Jackson as Chairperson of UVI's Education Division, the department's St. Croix faculty consisted of three white professors and one black professor. Lovern claims that Jackson, who is black, set out to make life miserable for the department's white faculty. Lovern alleges that, during her first meeting with the St. Croix faculty, Jackson announced that she was "here to take care of [her] own."[6] Lovern and the two other white professors understood that Jackson meant that she intended to favor the black professors.[7]

According to Lovern, Jackson constantly berated her and the other white professors, and regularly interfered with their work. She claims that Jackson criticized them unfairly, made derogatory comments to them, told them that they did not "know their place,"[8] unilaterally changed or took away their teaching assignments, and gave them less desirable teaching assignments than black professors.

Lovern accuses Jackson of attempting to reduce her compensation. Professors at UVI receive additional compensation for teaching advanced-level courses based on the number of eligible students enrolled in the course. In January of 2007, Lovern received a number of e-mails from Rita Howard, Jackson's Assistant Administrative

---

[6] Compl. ¶ 21.

[7] Compl. ¶ 22. Lovern produced the affidavits of the other two white professors, Kelly Kantz and Paul Abney. *See* Pl.'s Statement of Material Facts that Preclude Summary Judgment ("PSF"), Ex. 5 (Kantz Aff.) (Doc. No. 111-5); *id.* Ex. 13 (Abney Aff.) (Doc. No. 111-13). Those affidavits support many of Lovern's specific factual assertions about Jackson and generally support her claim that the white professors were subject to a variety of discriminatory statements and actions by Jackson. Kantz and Abney filed separate actions against UVI alleging race discrimination stemming from Jackson's term as the Division Chair. *See Kantz v. Univ. of the V.I.*, No. 08-0047 (D.V.I. 2008); *Abney v. Univ. of the V.I.*, No. 08-116 (D.V.I. 2008). Motions for summary judgment remain pending in both cases.

[8] PSF ¶ 63 (Doc. No. 111); Kantz Aff. ¶ 9; Pl.'s Opp. to Defs.' Mot. Summ. J. at 24-25 (Doc. No. 109) ("Pl.'s Opp.").

Chair, warning her that ineligible students were in her classes.  The following month, Jackson sent Lovern an e-mail notifying her that one of her advanced-level courses was under-enrolled because several students taking the course had not satisfied the prerequisites.  Jackson stated that Lovern was responsible for ensuring the eligibility of each student in her course.  Jackson informed Lovern that she would not receive compensation for teaching ineligible students.  Nevertheless, Lovern eventually received compensation for all the students she believed were properly taking her course.[9]

Lovern claims that Jackson's unsuccessful attempt to reduce her pay was part of her campaign against the white professors.  She contends that the students in question were properly enrolled in the course because they had permission from the Provost. Lovern claims that Denis Griffith, a black professor in the Education Division in St. Croix teaching a course with the same prerequisites as her course, had students enrolled in his course who were ineligible.  Jackson did not reprimand him or threaten to reduce his compensation.

The defendants counter that Jackson was simply doing her job as chair of the Education Division.  Specifically, they claim that it was her responsibility to ensure academic integrity by restricting enrollment in advanced courses to those students who had satisfied the prerequisites.  The defendants assert that this policy applied to all faculty members equally.

---

[9] Pl.'s RDSF Ex. 26 (E-mail from J. Sokolski to J. Lovern) at 1 (Doc. No. 111-26).

In late February and early March, Lovern complained about Jackson's behavior in a series of e-mails sent to John Sokolski, UVI's Human Resources Director.[10]  Lovern told Sokolski that Jackson was attempting to have her teach certain students without compensation and that Denis Griffith, a black professor in the Education Division, was not subject to the same treatment.  She concedes that the e-mails did not discuss race or discrimination.[11]  She claims that she also complained to LaVerne Ragster, UVI's President, that Jackson was targeting the white faculty in the department.

On March 7, 2007, the day she was scheduled to go before the Faculty Review Advisory Committee ("FRAC") as part of her tenure application review process, Lovern found a letter from Jackson on her desk.  She did not read it until after she returned from her interview.  In the letter, Jackson accused Lovern of engaging in unethical behavior and violating department policies by allowing ineligible students to remain in her classes despite repeated warnings from her and Howard.[12]

Lovern claims that Jackson wrote the letter in retaliation for her complaints to Human Resources and UVI's President.  She also contends that Jackson intentionally delivered the letter just before Lovern's FRAC interview to distract her and to affect her performance in the interview in an effort to jeopardize her tenure application.

At some point in 2007, Lovern and nine other faculty members in the Education Division lodged a complaint against Jackson and Howard, alleging that Jackson

---

[10] *See* Pl.'s RDSF ¶ 80; *id.* Ex. 26.

[11] Pl.'s RDSF ¶ 81.

[12] Pl.'s RDSF Ex. 12 (Mar. 5, 2007 Letter) (Doc. No. 111-12).

engaged in "undemocratic, disrespectful, and discriminatory behaviors."[13]   They expressed their lack of confidence in Jackson's leadership.   Dr. Utha Williams, then Interim Executive Director of Global and Graduate Education, was charged with reviewing the grievance.   In her May 3 recommendation, Williams recommended that the faculty's vote of no confidence be taken seriously and considered a "serious warning of the need for administrative review."[14]   She recommended that UVI undertake "aggressive effort[s] to address all the issues outlined by the faculty."[15]   After Dr. Williams' recommendation was reviewed by an Ad Hoc Administrative Review Panel, it concluded that Jackson had retaliated against the faculty.[16]   Jackson's employment contract was not renewed when it expired on July 20, 2008.

*Denial of Lovern's Tenure Application*

The tenure application process, as prescribed by the UVI Faculty Policy Manual ("FPM"), is a multi-tiered one.   First, a professor must submit her tenure application to the FRAC, which is composed of seven tenured faculty members who are elected by the UVI faculty.[17]   If the FRAC decides the applicant should be granted tenure, it forwards its recommendation to UVI's Provost.[18]   The Provost then reviews the candidate's application and the evaluations of the candidate's work collected from other

---

[13] Pl.'s RDSF Ex. 31 (May 3, 2007 Grievance Recommendation) at 1 (Doc. No. 111-31).

[14] May 3, 2007 Grievance Recommendation at 2.

[15] May 3, 2007 Grievance Recommendation at 2.

[16] Defs.' Statement of Undisputed Material Facts ¶ 73 (Doc. No. 100) ("DSF").

[17] PSF, Ex. 6 (FPM) §§ 5(c)(i), 5(h) (Doc. No. 111-6).

[18] *Id.* § 5(c)(i).

academics.[19]  As part of the review, the Provost must "consult with the division Chair of each candidate under review, and with members of the University community or of the candidate's academic discipline who are qualified to evaluate the candidate's record."[20] After conducting his evaluation, the Provost forwards his recommendation, the FRAC's recommendation and all the evaluations he collected to the President.[21]  The President forwards all the materials to the Board of Trustees along with her recommendation.[22]

The Academic, Research and Student Affairs Committee ("ARSA") of the Board evaluates the application and makes a recommendation to the full Board.  The Board of Trustees makes the final decision.[23]  Under UVI by-laws, the final decision is by majority vote.[24]

Lovern submitted her tenure application in December 2006 and met with the FRAC on March 7, 2007, the same day she received the letter from Jackson.  There is no evidence that the members of the FRAC ever read Jackson's letter.  Lovern concedes that the FRAC did not contact Jackson regarding her tenure application.  The FRAC recommended Lovern for tenure and forwarded its recommendation to Provost Musah.

According to Lovern, once the FRAC recommended that she receive tenure, "there was little more that Jackson could do" directly to ensure that Lovern was

---

[19] *Id.* § 5(c)(ii).

[20] *Id.*

[21] *Id.* § 5(c)(iii).

[22] *Id.*

[23] *Id.*

[24] PSF, Ex. 8 (UVI Bylaws) at Art. III § 4(a) (Doc. No. 111-8).

terminated.[25]  Consequently, she argues that Jackson enlisted Musah, who is black, to use his crucial role in Lovern's tenure review process to ensure that Lovern was denied tenure.  Musah denies that he colluded with Jackson.  He claims that he did not even discuss Lovern's application with Jackson before the Board's vote.

On May 7, 2007, Musah wrote to Lovern requesting additional information he needed to finalize his review of her tenure application.  He requested copies of the two scholarly articles that Lovern had listed on the curriculum vitae ("CV") she had submitted with her application in 2002.  One was listed on her CV as "accepted for publication," and the other as "currently in [the] journal review process."[26]  Lovern believed that Musah asked about those articles because they were not included on the updated CV that she submitted with her tenure application.  Lovern explains that she removed the articles because they ultimately were not published.

Lovern testified that she did not receive Musah's letter until four days later.  In the meantime, without waiting for Lovern's response, Musah submitted a letter to President Ragster dated May 8, recommending Lovern for tenure.[27]

Lovern claims that almost immediately after receiving the letter requesting the articles, she informed Musah's assistant, Maria Fleming, that she would look for them. On May 12, Lovern sent a copy of one of the manuscripts to Fleming and informed her by letter that she could not locate a copy of the second article.  According to Lovern, Fleming advised her that she did not need to submit any additional information.

---

[25] Pl.'s Opp. at 14-15.

[26] Pl.'s RDSF Ex. 14 (May 7, 2007 Letter from Musah to Lovern) (Doc. No. 111-14).

[27] Pl.'s RDSF Ex.16 (May 8, 2007 Letter from Musah to L. Ragster) (Doc. No. 111-16)

President Ragster recommended Lovern for tenure and forwarded her application to the ARSA committee. The ARSA committee discussed Lovern's application during its May 16 meeting. Although the parties disagree about the implications of the committee's discussion, it is clear that some of the trustees were concerned that they had not received copies of articles listed on Lovern's 2002 CV. Members of the committee questioned why they had not received those documents and requested them before the June 16, 2007 meeting of the full Board of Trustees.[28]

Musah, despite his assistant's assurances to Lovern that nothing more was needed, did not inform the committee that Lovern had submitted one article and offered to locate the other. Instead, he acted as if Lovern had not responded and expressed his concern about the missing articles. The committee requested copies of the articles prior to the June 16 Board meeting. There is no evidence that the ARSA committee's request was communicated to Lovern. Nor is there any evidence that Musah or anyone else informed the committee members that after Lovern had provided one of the articles and offered to supply the other, she was told that nothing more was necessary. Nevertheless, the ARSA committee approved Lovern's application and forwarded its recommendation to the full Board.

On June 16, the Board of Trustees met to discuss Lovern's tenure application. At the meeting, some trustees expressed concern about the missing articles, which had been requested at the May 16 ARSA meeting. Musah, who was present at the Board meeting, advised that he shared their concerns and had communicated those concerns to Ragster. There is no evidence that Musah informed the Board that Lovern had

---

[28] DSF ¶ 47.

responded to his May 7 request by supplying one article and offering to find the other one.

At the meeting, Ragster supported Lovern's application.  She cautioned that it would be difficult to deny Lovern tenure after the FRAC had approved her application because to do so would undermine the faculty's ability to review its peers.

The Board voted on Lovern's tenure application.  Of the thirteen trustees present at the meeting, four voted in favor of granting Lovern tenure, none voted against, eight abstained, and one recused.  The trustees interpreted this vote as a denial of tenure.

By letter dated July 11, 2007, Musah notified Lovern that her application had not been approved.  Lovern says she received the letter from Musah in person "a couple of days later."[29]  The letter informed Lovern that her employment with UVI would terminate on May 15, 2008, the date her contract was set to expire.  The parties agree that professors who are denied tenure must be terminated under the FPM.  They disagree on the length of time Lovern was entitled to remain at UVI after the denial.

According to Lovern, even though Musah had been present during the Board meeting and had feigned concern about the two articles, he told her that he did not know why she had been denied tenure.  Lovern asserts that Musah lied in order to conceal his role in sabotaging her application.  She claims that she did not learn of the Board's concern about the missing articles until one month later.

On July 10 or 11, 2007, Musah called Jackson who was on vacation at the time and asked to meet with her.  The two met on a public bench in Christiansted.  During that conversation, Musah informed Jackson that Lovern had been denied tenure.

---

[29] PSF Ex. 10 (Mar. 26, 2010 Lovern Dep.) at 73:13-18 (Doc No. 111-10).

Lovern cites this conversation and Musah's consultation with Jackson during his review of her tenure application, which Jackson disputes, as evidence that the two colluded to get her fired.  She claims that it was unusual for the two to meet off campus and for Musah not to tell Jackson about the Board's decision over the phone, particularly when she was on vacation.

On August 16, 2007, Lovern wrote a letter to President Ragster asking that the Board reconsider her tenure application.  The request included a descriptive chronology, explaining that her 2002 CV, at the time, accurately described one article as "accepted for publication" and the other as "currently in the journal review process."[30] Lovern's request for reconsideration was denied on September 27, 2007.

### Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion, we must draw all reasonable inferences in the nonmovant's favor.  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party.  Fed. R. Civ. P. 56(a).  Once the moving party has met its burden, the nonmoving party must counter with "'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

---

[30] Pl.'s RDSF ¶ 56.

574, 587 (1986) (citation omitted).  The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which she bears the burden of production.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment.  *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

### Employment Discrimination

*Statute of Limitations*

A plaintiff must file her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within 300 days of her employer's unlawful act.  42 U.S.C. § 2000e-5(e)(1); *Haase v. Gov't of the V.I.*, No. 02-110, 2009 WL 3855888, at *3 (D.V.I. Nov. 17, 2009) (citing *Bostic v. AT&T of the Virgin Islands*, 166 F. Supp. 2d 350, 356 (D.V.I. 2001)).  Claims based on acts that occurred more than 300 days before filing the EEOC charge are time-barred.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

Discrete discriminatory acts that occurred before the statutory time period are not actionable under Title VII.  *See Morgan*, 536 U.S. at 113.  The Supreme Court has provided a "non-exhaustive list of discrete acts for which the limitations period runs from [the date of] the act: termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, wrongful accusation." *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) (citing *Morgan*, 536 U.S.

12

at 113-14).  "[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period."  *Morgan*, 536 U.S. at 112.  *Morgan* distinguishes between individual discriminatory acts that constitute separate causes of action and linked acts that together make out a single cause of action.  *See id.* at 114-15.  *Morgan* sets out examples of discrete discriminatory acts of the former category.  *Id.* at 114. Those acts cannot be aggregated to make time-barred claims timely by linking them to discrete acts under a continuing violation theory.  *Id.*  Although a discrete act may have a connection to other acts, that is, it may be motivated by the same discriminatory animus, it is not linked to the other acts for the purpose of determining whether it falls within the statutory period.   In short, discrete acts cannot be aggregated under a continuing violation theory to save time-barred acts.  *See O'Connor*, 440 F.3d at 127.

The bases of Lovern's discrimination claim are two adverse actions – her denial of tenure and termination.[31]  These two actions constitute a single discriminatory act for purposes of the statute of limitations.  *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980).  Her termination was linked to her denial of tenure.  Thus, the statute of limitations was triggered by the denial of tenure.

As in *Ricks*, Lovern's termination was not a separate act of discrimination, but an inevitable consequence of the denial of tenure under the University's policies.  *Id.* at

---

[31] In her complaint, Lovern also based her discrimination claim on Jackson's refusing to approve her grant proposal, attempting to dock her pay and accusing her of wrongdoing. Compl. ¶ 19.  However, as she concedes in her opposition to the motion for summary judgment, Jackson's efforts did not result in any adverse employment action.  Pl.'s Opp. at 32.  To form the basis of a Title VII claim, an employer's action must result in a "significant change in employment status."  *See Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006) (quoting *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  Lovern concedes that Jackson was unable to lower her pay and that Jackson's letter accusing her of wrongdoing was removed from her file following an administrative appeal.  DSUMF Nos. 94-95.  These acts, though admissible to show Jackson's animus and hostility, do not form the bases for Lovern's racial discrimination claim.

257-58.   Pursuant to UVI's policy, similar to the one in *Ricks*, after an unsuccessful tenure candidate's contract expires, she is automatically separated from the University.[32]   Lovern alleges that her termination was the product of Jackson and Musah's discriminatory actions.   She does not claim that she was treated differently than similarly situated unsuccessful tenure applicants.   Accordingly, her discrimination claim is timely only if she filed her charge within 300 days of when she learned or should have learned she was denied tenure.

To decide whether Lovern's denial of tenure claim is timely, we must determine when the statute of limitations began to run and when Lovern filed her EEOC charge. The parties dispute both dates.

The defendants argue that the limitations period was triggered when the Board of Trustees denied Lovern tenure on June 16, 2007.   Lovern contends that the limitations period began to run on July 11, 2007, the date of Musah's letter informing her of the Board's decision, or a few days after, when she received the letter.

The statute of limitations starts running on the date the plaintiff discovers, or should have discovered, that she has been injured.  *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 590 (3d Cir. 2005) (citing *Keystone Ins. Co. v. Houghton*, 863 F.2d 1125, 1127 (3d Cir. 1988)); *see also Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1386-87 (3d Cir. 1994).   Therefore, the statutory period began to run no earlier than July 11, 2007, the date of the letter informing Lovern of the Board's denial of tenure.

---

[32] FPM, §§ 4(d)(ii)(a) and 4(f).

14

When Lovern filed her charge is disputed by the parties.  Yet, the evidence is clear that she filed her charge within the statutory period.

Lovern alleges that she filed her charge with the Virgin Islands Department of Labor ("VIDOL") on February 28, 2008, which satisfied her filing duty under Title VII.[33] She relies on an EEOC investigative log listing February 28, 2008 as the filing date,[34] and a copy of her VIDOL charge dated and notarized that same day.[35]  She has also produced a letter from UVI's counsel dated March 20, 2008 stating that Lovern was in the process of pursuing an EEOC complaint.[36]

The defendants counter that Lovern did not file a charge until she filed directly with the EEOC on May 6, 2008.  They rely on EEOC communications to the Department of Justice, VIDOL's listing of May 6, 2008 as the filing date, and a letter from Lovern's former attorney indicating that her charge had been filed directly with the EEOC.[37]  They assert that the evidence does not support Lovern's claim that she filed with the VIDOL earlier, noting that she has not produced any time-stamped record of her charge.[38]

Alternatively, the defendants argue that even if Lovern did file with the VIDOL on February 28, her charge cannot be deemed filed with the EEOC until April 28, 2008

---

[33] Lovern clarified her position as to when she filed for the purposes of the statute of limitations in her Supplemental Memorandum in Opposition to Defendants' Motion to Dismiss.  Pl.'s Supplemental Mem. at 1-2 (Doc. No.114-1).  She filed this supplement after filing her opposition to the motion for summary judgment.

[34] Pl.'s Opp. Ex. 29 at 4 (Doc. No. 111-29).

[35] Id. at 19.

[36] Pl.'s Opp. Ex. 30 at 3 (Doc. No. 111-30).

[37] Defs.' Reply to Pl.'s Opp. Ex. 4 at 14-16 (Doc. No. 116-4).

[38] Id. at 16.

under Title VII's sixty-day deferral rule.  Under that rule, if a plaintiff first files her charge with a state or local agency, she must wait sixty days to file with the EEOC or until the state or local agency terminates its investigation, whichever occurs earlier.  42 U.S.C. § 2000e-5(c); *Morgan*, 536 U.S. at 119.

Under the worksharing agreement between the VIDOL and the EEOC,[39] the VIDOL waived the sixty-day deferral requirement.  Worksharing Agreement § III.A (2008).  Section III.A contains a waiver of the VIDOL's exclusive jurisdiction over charges that are to be "initially processed by the EEOC," including all Title VII charges received by the VIDOL.  *Id.*  Similar to other worksharing agreements, the one between the VIDOL and the EEOC provides that each agency designates the other as its agent for the purpose of receiving charges.  Worksharing Agreement, § II.A.  Section II.C states that charges received by the DOL that are "jurisdictional with the EEOC and timely filed . . . will be automatically dual-filed with the EEOC" and that the date of filing is when the charge is received.  *Id.* § II.C.  Such claims include those brought under Title VII.  *Id.* § I.1.

The EEOC's investigative log shows that Lovern filed her charge with the VIDOL on February 28, 2008, the same date that her charge was dated and notarized.[40]  The evidence relied upon by the defendants suggests that it was filed on May 6, 2008.  This factual dispute is not material.  Whether Lovern filed her charge on February 28, the date she contends she did, or May 6, the date the defendants contend she did, her

---

[39] Although neither party provided us with a copy of the Virgin Islands worksharing agreement, we take judicial notice of it as it is a public document.  *See Fox v. Thermoform Plastics, Inc.*, CIV 06-4507 DWF/SRN, 2007 WL 2376651, at *3 (D. Minn. Aug. 16, 2007) (taking judicial notice of a worksharing agreement).

[40] Defs.' Mot. Dismiss Ex. 3 (EEOC Charge of Discrimination) (Doc. No. 87-3); PSF Ex. 29 at 4 (EEOC Investigative Log) (Doc. No.111-29).

denial of tenure claim is timely.  Taking May 6, 2008 as the filing date, any claims she asserts that occurred within the 300-day period before that date, that is, on or after July 11, 2007, are timely.  Therefore, because her denial of tenure claim occurred on or a few days after July 11, 2007, her charge, whether filed on February 28 (233 days later), or May 6 (300 days later), was timely.

### *The Merits*

A claim of intentional employment discrimination based on disparate treatment may be proven by either "direct" evidence of discriminatory intent or "indirect" evidence from which one can infer an intent to discriminate.  *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008); *Logue v. Int'l Rehab. Assocs.,* 837 F. 2d 150, 153 (3d Cir. 1988) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981)).  Lovern does not present any direct evidence of discriminatory intent.  Instead, she supports her claim with evidence she contends permits an inference of discrimination.  Therefore, the familiar three-step *McDonnell Douglas* burden-shifting standard applies.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)*; C.A.R.S.*, 527 F.3d at 364.

Under the *McDonnell Douglas* analysis, Lovern must first establish a *prima facie* case.  If she does, the burden shifts to the defendants "to identify a legitimate, nondiscriminatory reason for the adverse employment action."  *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009) (citation omitted).  If the defendants satisfy that burden, Lovern must produce evidence from which a reasonable fact finder could conclude that the proffered reason for taking the adverse action was merely a pretext for intentional discrimination.  *Id.* (citation omitted).  The final burden of production

"merges with the ultimate burden of persuading [the jury] that she has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256.

To make out a *prima facie* case of discrimination, Lovern must show that: (1) she is a member of a protected class; (2) she was qualified for tenure; and (3) she was denied tenure under circumstances giving rise to an inference of unlawful discrimination. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013); *Sarullo v. U.S. Postal Service*, 352 F.3d 789, 797 (3d Cir. 2003) (citation omitted). Establishing a *prima facie* case of discrimination "'is not onerous and poses a burden easily met.'" *C.A.R.S.*, 527 F.3d at 365 (citing *Burdine*, 450 U.S. at 253). In addition, the nature of the required showing to establish a *prima facie* case of disparate treatment by indirect evidence varies with the circumstances of the particular case. *C.A.R.S.*, 527 F.3d at 365 (citing *Jones v. School Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999)); *Torre v. Casio, Inc.*, 42 F.3d 825, 830 (3d Cir. 1994) (citation omitted).

Lovern has made out a *prima facie* case of racial discrimination. She is a member of a protected class. She was qualified for tenure as reflected by the favorable recommendations of the FRAC, the Provost and the President, and the unanimous vote for tenure by the only Board members who voted. She has also produced evidence of circumstances which give rise to an inference of discrimination.

As to the third element, Lovern does not allege that the Board of Trustees was motivated by discriminatory animus when it failed to approve her tenure application. Rather, asserting a "cat's paw" theory, she claims that Jackson and Musah acted out of discriminatory animus in causing the Board to deny her tenure. Under a "cat's paw" theory, the employer is liable for the discriminatory actions of non-decisionmakers when

18

the non-decisionmakers, motivated by illegal animus, caused the employee's termination.[41]  *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 (2011); *McKenna v. City of Phila.*, 649 F.3d 171, 177-78 (3d Cir. 2011).[42]

To prevail under a "cat's paw" theory, Lovern must demonstrate that: (1) the non-decisionmaker performed an act motivated by discriminatory animus for the purpose of causing the adverse employment action; and (2) the non-decisionmaker's act was the proximate cause of the adverse employment action. *Staub*, 131 S. Ct. at 1194.[43]

Lovern need not prove that the decisionmaker knew that the non-decisionmaker was motivated by a discriminatory bias.  Nor does she have to prove that the non-decisionmaker controlled the decisionmaker.  She need only prove that the decisionmaker made the adverse employment decision at the non-decisionmaker's instigation.  The critical inquiry is whether the non-decisionmaker's actions so influenced the decisionmaker's decision that it was the proximate cause of the action.

Lovern alleges that both Jackson and Musah, who are black, were biased against her because she is white.  She attributes this bias, at least in part, to UVI's 2006-2009 Master Plan, which states that one of the University's goals is to evaluate the racial diversity of the faculty and "develop a plan to remediate deficiencies."[44]  The

---

[41] As noted by the Supreme Court, the term "cat's paw" derives from one of Aesop's fables.  It became part of United States employment law in *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990).  The fable tells the story of a monkey who uses flattery to get a cat to grab roasting chestnuts from a fire.  When the cat burns its paws getting the chestnuts, the monkey flees with them, leaving the cat with nothing.  *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 n.1 (2011).

[42] Because Title VII does not provide for individual liability, Lovern cannot bring her discrimination claim against Jackson and Musah individually.  She must show that UVI is liable.  *See Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996).

[43] The Third Circuit has applied *Staub* to a Title VII case.  *See McKenna*, 649 F.3d at 177-78.

[44] Pl.'s Opp. Ex. 3 (UVI Academic Master Plan) at 35 (Doc. No. 111-3).

Provost and the division chairs are responsible for achieving this goal.  According to Lovern, Jackson, as the chair of the Education Division, and Musah, as Provost, decided to carry out their responsibility to diversify the faculty under the Master Plan by purging the Education Division of its white professors.

Lovern asserts that because it is difficult to fire a professor under UVI's policies, Jackson had to resort to unofficial means to rid the Education Division of white faculty. She claims that Jackson waged a relentless campaign of discrimination and harassment against her and the other white professors.  She contends that, as the capstone of that campaign, Jackson colluded with Musah to cause UVI's Board of Trustees to deny her tenure and terminate her employment.

The only thing questionable about Lovern's qualifications presented to the Board was the publications issue.  According to Ragster, UVI's 30(b)(6) witness, nothing else was remarkable about Lovern's tenure application.  Lovern has produced evidence that Musah intentionally did not inform the Board of Trustees that she had responded to his inquiry about the articles, creating the impression that they did not exist.  Furthermore, Musah did not inform Lovern that the ARSA committee requested additional documentation from her before the full Board's June 16 meeting, preventing her from responding to the committee's concern.  This evidence could permit a jury to conclude that Musah intentionally withheld the information that was critical to the Board's action for the purpose of scuttling her application.

Lovern cannot show that Jackson intentionally caused her to be denied tenure due to racial animus.  Although Lovern has introduced evidence that could show that

Jackson harbored discriminatory intent,[45] she has produced no evidence that Jackson's conduct caused the Board to deny her tenure.  She concedes that Jackson played no part in the tenure review process at the FRAC or Board level, and that Jackson's input on her tenure application was not sought by UVI's President.[46]  Lovern points to the FPM's provision requiring Musah to consult with the Division Chair, Jackson, before making his recommendation to the President[47] and their off-campus meeting after the Board's decision as evidence that he and Jackson had agreed to collectively sabotage her tenure application.  Jackson, who had been employed at UVI for six months when Lovern submitted her tenure application and who had performed no evaluations of Lovern's work, testified that she was not aware of Lovern's tenure application.  Even drawing all reasonable inferences in Lovern's favor, her claim that Musah and Jackson colluded is speculative.  That Musah told Jackson about the Board's decision after it was made does not support Lovern's contention that the two had colluded earlier.

Suspicion of discriminatory acts is not enough.  There is no evidence that Jackson, unlike Musah, did anything to instigate the Board's decision to deny Lovern tenure.  However, Jackson did not move for summary judgment.  Had she done so, her motion most likely would have been granted.

### Retaliation

Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or

---

[45] PSF Ex. 13 ¶ 7 (Affidavit of Paul Abney) (Doc. No. 111-13); *id.* Ex. 5 ¶ 11 (Affidavit of Kelly Kantz) (Doc. No. 111-5).

[46] Pl.'s RDSF at ¶¶ 38-40 (Doc. No. 110).

[47] *See* FPM § 5(c)(ii).

because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . . ."  42 U.S.C. § 2000e-3(a) (2006).  Lovern alleges that she complained to President Ragster that Jackson was discriminating against her and the other white professors in the Education Division.  She claims that in retaliation for making complaints, Jackson refused to approve her grant proposal, attempted to dock her pay and wrote a letter accusing her of improper behavior.  The ultimate retaliation, according to Lovern, came when Muash and Jackson orchestrated her denial of tenure and termination.[48]

Lovern does not allege that the members of the Board of Trustees were motivated by retaliatory animus when they failed to approve her tenure application.  Rather, similar to her discrimination claim, she alleges a "cat's paw" theory,[49] contending that Jackson and Musah acted with a retaliatory motive in causing the Board to deny her tenure.  See Staub, 131 S. Ct. at 1189-90; McKenna, 649 F.3d at 177-78.[50]

To succeed on a retaliation claim under Title VII, Lovern must prove: (1) that she complained about racial discrimination; (2) that UVI took an adverse employment action against her after or contemporaneous with her complaint; and (3) that there is a causal

---

[48] As discussed in the discrimination section, Lovern's denial of tenure and termination are considered a single unlawful act for purposes of the statute of limitations.  Because Lovern concedes that the only adverse employment action supporting her retaliation claim is the denial of tenure, we need not consider her other allegation that, in retaliation for her complaints, on March 5, 2007 Jackson wrote a letter accusing her of unethical behavior.  In any event, the claim is akin to wrongful discipline and constitutes a discrete discriminatory act.  O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006).  Therefore, it would be untimely because it occurred before May 4, 2007, or 300 days before February 28, 2008, the earliest date Lovern could have filed her charge.

[49] Staub's standards for "cat's paw" liability apply to Title VII retaliation claims.  See McKenna, 649 F.3d at 180.

[50] Because Title VII does not provide for individual liability, Lovern must show that UVI is liable for the retaliatory acts.  See Dici v. Pennsylvania, 91 F.3d 542, 552 (3d Cir. 1996).  She cannot bring her retaliation claim against Jackson and Musah individually.

link between her complaint and the adverse employment action. *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 286 (3d Cir. 2001).

The defendants argue that Lovern never complained of discrimination. They point to e-mails between Lovern and UVI's then Human Resources Director, John Sokolski, complaining of Jackson's actions towards Lovern, but not of racial discrimination. Consequently, so they argue, Lovern was not engaged in a protected activity. However, Lovern testified in her deposition that she complained to Ragster about Jackson's discriminatory behavior against her and the other white professors in the Education Division.[51]

The defendants cannot genuinely dispute that Lovern and other faculty in the Education Division filed a grievance alleging that Jackson engaged in "discriminatory behaviors" towards them.[52]   There is no question that Lovern filed a grievance of discrimination. Therefore, there is no real factual dispute that Lovern engaged in a protected activity when she and the other white professors complained of racial discrimination.

Lovern has made a sufficient showing of a causal nexus between her complaints about racial discrimination and the denial of tenure. She complained of discrimination sometime before May 3, 2007, when her grievance was addressed. Dr. Williams, who considered the grievance, concluded that it was founded. She recommended that UVI take "aggressive effort[s] to address" the retaliatory and discriminatory practices of

---

[51] Pl.'s Opp. Ex. 11 (Nov. 19. 2009 Lovern Dep.) at 201:9-202:8 (Doc. No. 111-11).

[52] *See* PSF Ex. 31 (May 3, 2007 Grievance Recommendation) at 2.

Jackson against the Education Division's faculty members.[53]   This recommendation reflects that Williams determined that the complaints were credible and required remediation.  One can infer that the finding was a repudiation of Jackson's conduct.

Two weeks after the recommendation, which was addressed to him,[54] Musah attended the May 16 ARSA committee meeting regarding Lovern's tenure application. Although the committee requested copies of the two articles on Lovern's 2002 CV, Musah, who presented her application package to ARSA, did not relay that request to Lovern.  A month later at the June 16 Board of Trustees meeting, Musah expressed concern about the missing articles.  Significantly, he did not inform the Board that Lovern had submitted a copy of one of the articles to him and offered to search for the other article.  One could reasonably infer that he acted to cause the Board to deny Lovern tenure because she had complained about discrimination.

This sequence of events and the temporal proximity of Musah's behavior at the meetings are sufficient to establish a causal link between Lovern's complaints and her denial of tenure based on a "cat's paw" theory.  *Abramson*, 260 F.3d at 288 (temporal proximity is sufficient to establish a causal link) (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997)).  Therefore, the moving defendants are not entitled to summary judgment on Lovern's retaliation claim.[55]

---

[53] May 3, 2007 Grievance Recommendation at 2.

[54] The May 3 grievance recommendation is addressed to Musah.  May 3, 2007 Grievance Recommendation at 1.

[55]  We reiterate that Lovern has not produced evidence that Jackson did anything that caused the Board to deny her tenure application.  Again, she acknowledges that Jackson had no role in the tenure review process at the FRAC or Board level, and that Ragster did not seek input from Jackson on her tenure application.  Pl.'s RDSF at ¶¶ 38-40 (Doc. No. 110).  Therefore, had she moved for summary judgment, Jackson would be entitled to judgment in her favor on Lovern's retaliation claim.

## Hostile Work Environment

Before addressing whether there are disputed issues of fact regarding Lovern's hostile work environment claim, we must determine whether it is barred by the statute of limitations.  For purposes of this analysis, we shall assume that the factual bases of her claim are true.

If Lovern filed her charge with the EEOC on February 28, 2008, any discrete unlawful action occurring more than 300 days prior to the filing, that is, before May 4, 2007, is barred.[56]  However, hostile work environment claims are subject to a different rule.  A hostile work environment claim is timely filed so long as one act that is part of a collection of individual acts contributing to the claim occurred within the 300-day window.  *Morgan*, 536 U.S. at 117.  Thus, a hostile work environment claim that includes acts that occurred outside the 300-day period and at least one contributing act that occurred within the time period, is timely.  *Id.* ("A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice.") (citations omitted).

The only action Lovern cites as contributing to the hostile work environment that occurred on or after May 4, 2007, that is, within the 300-day period, is the denial of tenure.  But, that action is a discrete act that cannot form part of her hostile work environment claim.  Discrete acts are "different in kind" from hostile work environment claims.  *Morgan,* 536 U.S. at 115.  A discrete discriminatory act is actionable under Title VII by itself.  A hostile work environment claim is comprised of numerous lesser acts

---

[56] For purposes of our discussion, we use only the February 28 filing date, because whichever date we use, Lovern's hostile work environment claim is untimely.

which are not individually actionable, but when aggregated, form a single unlawful employment practice.  *See id.* at 115-17.

The denial of tenure is not part of Lovern's hostile work environment claim because it is individually actionable.  *See Jackson-Hall v. Moss Point Sch. Dist.*, No. 11-42, 2012 WL 1098524, at *3 (S.D. Miss. Apr. 2, 2012) ("Starting with the termination, the Court finds that it is a separate discriminatory act and not part of the hostile-work-environment claim."); *see also Hartz v. Adm'rs of Tulane Educ. Fund*, 275 Fed. App'x 281, 289 (5th Cir. 2008) (*per curiam*) ("[T]he district court's suggestion that Hartz's denial of tenure, an allegedly discrete discriminatory act, could be 'intertwined' with her hostile work environment claim is foreclosed by *Morgan* and *Ledbetter*.").  Hence, it cannot be used to save claims based on earlier acts that occurred more than 300 days before she filed her charge.

Lovern has not presented evidence of any act supporting her hostile work environment claim that occurred within the relevant 300-day period.  She based her hostile work environment claim on Jackson's subjecting her to racial comments, refusing to approve her grant proposal, attempting to dock her pay and accusing her of wrongdoing.[57]  These events all occurred before May 4, 2007.  Accordingly, her hostile work environment claim is barred by the statute of limitations.

### Intentional Interference with an Employment Relationship

Lovern asserts that Jackson and Musah, in their individual capacities, interfered with her employment contract with UVI.  She claims that they improperly interfered in the tenure review process with the aim of causing the Board to deny her application for

---

[57] *See* Compl. ¶ 30.

tenure.   In moving for summary judgment, Musah contends that his actions do not amount to improper interference because he was acting on behalf and in furtherance of the University's interests.

To succeed on her tortious interference claim, Lovern must prove the following elements: (1) the existence of a valid contract; (2) Musah and Jackson had knowledge of the contract; (3) they improperly and intentionally interfered with the contract; (4) the interference proximately caused UVI to fail to perform; (5) Musah and Jackson intended to harm her by interfering with the contract; and (6) the breach caused her harm.  *Gov't Guar. Fund of Finland v. Hyatt Corp.*, 955 F. Supp. 441, 452 (D.V.I. 1997).

The first two elements are undisputed.  Lovern had a contract with UVI.  Musah knew of the contract.

Lovern must show that Musah improperly and intentionally interfered with her contract.  *Id.* at 453. The defendants contend that Lovern's intentional interference claim fails because Musah was acting as an official of UVI.  If so, he cannot be liable for interfering with Lovern's contract.   Because an entity or its agents cannot tortiously interfere with the entity's own contract, Lovern can prevail only if she can show that Musah was acting outside the scope of his employment.  *See Ruder v. Pequea Valley Sch. Dist.*, 790 F. Supp. 2d 377, 395 (E.D. Pa. 2011); *Sorber v. Glacial Energy VI, LLC*, Civ. No. 10-588, 2013 WL 945461, at *6 (V.I. Super. Ct. March 7, 2013).

Musah was required by the FPM to participate in Lovern's tenure review.  As part of his job, he was charged with reporting truthfully and accurately.  His actions before the ARSA committee and the full Board, taking the facts in the light most favorable to Lovern, give rise to an inference that he did not do so.  Musah withheld from Lovern the

ARSA committee's request for her articles, preventing her from responding.  At the June 16 Board meeting, Musah acted as if Lovern had not been truthful on her CV, feigning concern about the missing articles.  He did not inform the Board that Lovern had responded to his request by supplying a copy of one article and offering to look for the other.

Ragster testified that during the meeting, the Board's only concern was Lovern's publications, which were "out of the ordinary."[58]  One could find that the only basis for denying Lovern tenure was the missing articles or an explanation for their absence.  Thus, there is sufficient evidence from which a jury could conclude that Musah acted outside the scope of his responsibility and did so improperly, ultimately causing UVI to deny Lovern's tenure application.

The evidence relating to Jackson's actions establish that they either fell within her scope of employment or did not interfere with Lovern's ability to perform her contract with UVI.  Regarding Lovern's claim that Jackson attempted to dock her pay, as Lovern's supervisor, Jackson was authorized by the University to ensure that Lovern was only teaching eligible students.  While she was not allowed to do so in a discriminatory manner, there is no evidence that her actions precluded Lovern from performing her contract with UVI.  Nor has Lovern established a violation by UVI of any provision of her employment contract resulting from Jackson's conduct.  *See Dreiling Millennium Trust II v. Reliant Renal Care, Inc.*, 833 F. Supp. 2d 429, 433-34 (E.D. Pa. 2011) (holding that a breach or nonperformance is necessary to sustain an intentional interference claim).

---

[58] PSF Ex. 2 (Ragster Dep.) at 171:8-12 (Doc. No. 111-2).

Lovern received full compensation for every student in her advanced level classes despite Jackson's letter.  After filing a grievance with the University, Jackson's letter was removed from Lovern's file, fulfilling the remedy sought by the grievance. Accordingly, the letter did not impede Lovern's ability to work within her contract.

With respect to her claim that Jackson acted to orchestrate her tenure denial, Lovern has provided no evidence that Jackson interfered with the tenure review process, either directly or through Musah.  There is no evidence that Jackson's actions caused nonperformance by either UVI or Lovern of the employment contract.  Had she moved, Jackson would be entitled to summary judgment.

### Defamation

Lovern alleges that publications made by the defendants stating that she was denied tenure were defamatory.  She claims these statements have adversely affected her professional reputation and caused her to repeat and comment on such statements when seeking employment.

The defendants argue that Musah's statement that Lovern was denied tenure was not defamatory because it was true.  *See Flanders v. Shell Seekers, Inc.*, 39 V.I. 63, 69, 1998 WL 667782, at *4 (V.I. Terr. 1998) (stating that truth is an absolute defense to a defamation claim, and the burden to prove such a defense lies with the defendant) (citing *Cohen v. Raedler*, 17 V.I. 46 (Terr. Ct. 1980)).  Lovern has not challenged this argument.  Nor could she.  Thus, Lovern's defamation claim fails because Musah's comments concerning Lovern's denial of tenure were true.  *See* Restatement (Second) of Torts § 581A, cmt. d. (1977).

29

**Breach of Contract**

Lovern asserts that UVI breached her employment contract when it denied her tenure without a final decision on her application and failed to give her sufficient notice of termination of her employment.   To succeed on her breach of contract claim, Lovern must establish four elements: (1) an agreement; (2) a duty created by the agreement; (3) a breach of that duty; and (4) damages.   *Bank of Nova Scotia v. Ross*, Civ. No. 2010-118, 2012 WL 4854776, at *4 (D.V.I. Oct. 12, 2012) (citing *Arlington Funding Services, Inc. v. Geigel,* 51 V.I. 118, 135 (V.I. 2009)).

*Improper Tenure Denial*

Lovern first claims that denying her tenure violated her employment contract. She asserts that the Board of Trustees did not follow the tenure procedure provided by the FPM.[59]   She contends that because a majority of the Board did not vote to deny her tenure, there was no final decision.   The FPM provides that the "final decision" on a candidate's tenure "will be made by the Board of Trustees."[60]   The FPM does not define "final decision."   Lovern, pointing to UVI's Bylaws and Robert's Rules of Order, implicitly argues that the term "final decision" is ambiguous.   The Bylaws state that "[a]ll actions taken by vote of a majority of those trustees present when a quorum has been established shall constitute action by the board[.]"[61]   Of the thirteen members present, only four voted to grant her tenure and none voted to deny her tenure.   Lovern contends

---

[59] A faculty policy manual is a treated as a contract where there is evidence that the employer intended to be bound by its terms.  *Smith v. V.I. Hous. Auth.*, Civ. No. 09-011, 2011 WL 797313, at *5 (D.V.I. Feb. 28, 2011) (citation omitted).  Here, UVI manifested its intent to be bound by the FPM by submitting Lovern's application for tenure to the FRAC in accordance with section 5(c)(i).  Moreover, UVI does not contest that it was bound by the FPM.

[60] FPM § 5(c)(iii).

[61] PSF Ex. 8 (UVI Bylaws) at Art. III § 4(a) (Doc. No. 111-8).

that, because abstentions do not count as votes, a majority of members did not vote either in favor or against her tenure application. Therefore, so Lovern argues, there was no final decision in violation of the FPM.

UVI counters that the Board complied with the FPM, which only required that a majority of the Trustees present at the June 16, 2007 meeting vote in favor of Lovern's application for tenure. Because only four of the thirteen Trustees present voted to approve Lovern's tenure application, UVI contends that she was properly denied tenure. Further, it argues that the Bylaws incorporate Robert's Rules of Order only to the extent they do not conflict with the Bylaws.

Whether UVI breached its contract with Lovern due to the Board's unusual vote requires us to determine whether the FPM is clear or ambiguous. A contract is clear or unambiguous "if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 93 (3d Cir. 2001) (citation omitted). In analyzing the contract, we must read the contract as a whole, putting its terms in context. *Engelhard Corp. v. N.L.R.B.*, 437 F.3d 374, 380-81 (3d Cir. 2006). Where the contract language is clear, we must construe the contract as a matter of law. *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir. 1994) (citations omitted). A contract provision is ambiguous if it can be interpreted in two alternative, reasonable ways, *Sunshine Shopping Ctr., Inc. v. Kmart Corp.*, 85 F. Supp. 2d 537, 540 (D.V.I. 2000), or if it is not defined and has no clear common or legal import. *Heebner v. Nationwide Ins. Enter.*, 818 F. Supp. 2d 853, 857 (E.D. Pa. 2011).

31

The term "final decision" in the FPM is ambiguous.  The term is not defined in the FPM, nor can we discern its clear legal or common meaning in this context.  *Cf. City of Erie, Pa. v. Guar. Nat. Ins. Co.*, 109 F.3d 156, 163 (3d Cir. 1997) (citations omitted). Therefore, its import must be determined based on extrinsic evidence.  This is a task for the jury.  *Nicholas v. Grapetree Shores, Inc.*, Civ. No. 05-119, 2013 WL 2298936, at *11 (D.V.I. May 23, 2013); *Sunshine Shopping Ctr.*, 85 F. Supp. 2d at 540 (stating that where a contract's terms are ambiguous, the trier of fact resolves the ambiguity in light of extrinsic evidence).  Hence, there is a genuine issue of material fact concerning whether the FPM imposed a duty that was breached by UVI's Board, precluding summary judgment.

*Inadequate Notice*

Lovern also argues that UVI violated the FPM's seventeen-month notice provision by terminating her on May 15, 2008, or ten months after the Board's tenure decision.  UVI argues that it is entitled to summary judgment because it complied with the FPM.  According to UVI, the contract of any faculty member denied tenure automatically converts to a terminal contract, negating the need for timely notice of termination.

The FPM's notice requirements are clear.  The FPM requires that faculty members, such as Lovern, who are not serving their initial contract and are terminated based on denial of tenure, be given notice in accordance with section 4(c).  That section requires that seventeen-month notice be given to such faculty members.  UVI's contention that Lovern's final two-year contract converted to a terminal contract when

she was denied tenure finds no basis in the FPM.[62]   Indeed, when read in context, the terminal contract provision ensures that UVI complies with its notice requirements by offering a terminal contract to a faculty member who otherwise would be terminated with less than seventeen months of notice.

UVI failed to comply with the FPM's requirements.   Given that less than seventeen months was left on Lovern's 2006-2008 contract, she was entitled to receive a terminal contract.   Accordingly, UVI is not entitled to summary judgment on Lovern's claim that it breached the FPM's notice provision.

*Damages*

UVI also argues that it is entitled to summary judgment on Lovern's breach of contract claims because she has failed to provide evidence showing that she suffered damages.   Lovern asserts that she suffered damages in the form of income loss, healthcare, moving and job search costs.   She has produced undisputed evidence that her base salary at her subsequent employer, Eastern Kentucky University, was $52,500, a sum less than the $54,655 salary UVI paid her.

The parties dispute whether Lovern received additional compensation from Eastern Kentucky for teaching summer courses in 2008.   However, the record is clear that Lovern began working at Eastern Kentucky University in September of 2008, not the summer of 2008.[63]

In summary, because the term "final decision" is ambiguous, UVI is not entitled to summary judgment on Lovern's claim that it breached her employment contract by

---

[62] A terminal contract is a one-year contract offered to a faculty member whose employment will not be renewed by UVI.  FPM § 4(f).

[63] Defs.' MSJ Ex. C (Nov. 19, 2009 Lovern Dep.) at 8:10:-9:5 (Doc. No. 106-1); PSF Ex. 10 (Mar. 26, 2010 Lovern Dep.) at 42:13-43:1, 43:18-21 (Doc. No. 111-10).

failing to make a decision.  Lovern has presented evidence showing that UVI did not comply with its duty to provide her with a seventeen-month notice of termination.  She has also produced evidence of damages. Therefore, we shall deny summary judgment on Lovern's breach of contract claims.

## Conclusion

Lovern has produced sufficient evidence, amid a record full of disputed facts, from which a reasonable factfinder could find that UVI, through Musah, denied her tenure as a result of prohibited discrimination and retaliation, and that Musah intentionally interfered with her contract.  Similarly, there are disputed issues of material fact bearing on her breach of contract claims against UVI.  On the other hand, the statute of limitations bars her hostile work environment claim.  She also cannot make out a cause of action for defamation.  Therefore, we shall grant the defendants' motion for summary judgment in part and deny it in part.